[Civ. No. 14097. Fourth Dist., Div. One. Mar. 18, 1976.]

JOHN HOWARD ROGERS, Plaintiff and Respondent, v.
EVAN V. JONES et al., Defendants and Appellants.

## COUNSEL

Gray, Cary, Ames & Frye and Terry D. Ross for Defendants and Appellants.

Chase, Rotchford, Drukker & Bogust, Roger J. Broderick, Dale W. Johnson and Toni Rae Bruno for Plaintiff and Respondent.

## OPINION

**AULT, J.**—Plaintiff John Howard Rogers was injured in the San Diego Stadium parking lot when he went to the aid of a private patrolman who

had been assaulted and knocked down by one of 53,000 fans leaving the stadium after a San Diego Charger football game. In this action for personal injuries, framed on the theory of negligent failure to control the crowd, a jury returned a verdict of $28,621 in his favor against the operator of the parking lot, Evan V. Jones Company, Inc. (Jones). The City of San Diego, the San Diego Chargers, Inc., and Tipton Patrol, Inc., originally named as defendants, had all been granted dismissals or nonsuits earlier in the proceedings.[1] The assailant was also named as a defendant in the complaint, but he apparently was not served with process. The major problem presented on appeal is whether Jones, the parking lot operator, owed plaintiff a duty of care.

The stadium parking lot was designed, constructed and, at all times relevant, owned by the City of San Diego. At the time of Rogers' injury, Jones was under contractual obligation to the city to "operate and manage" the parking facility, charging rates established by the city manager and paying the city 92.21 percent of the gross income from such operations. The city retained the right to withdraw portions of the lot from parking use and agreed to provide ordinary maintenance. The agreement provided that the City should not be liable for any death, injury or damage from any cause whatsoever in the parking facility and required appellant to hold the City harmless from all such claims.

After entering the "Operating Agreement" with the City, Jones entered into an oral agreement with Tipton Patrol, Inc. under which Tipton agreed to provide security services in the stadium parking lot by furnishing trained and qualified personnel.

Between the 1968 and 1969 football seasons, the City constructed a bus-taxi lane for a distance of 150 to 200 yards across the east side of the parking lot for the purpose of reducing traffic congestion and achieving a more efficient "dump" of the parking lot. The lane was separated from the rest of the parking lot by stanchions and chains. At the first football game held after this installation, it was discovered that some patrons removed the barricades and drove out the special lane. To discourage this practice, the stanchions were spiked, the chains were padlocked, and Jones assigned more personnel to the area, instructing them to avoid confrontations but still maintain the lane. Thereafter the bus-taxi lane caused no particular problem, and there had been no reports of any fights or injuries in the parking lot area.

---

[1] If judgments were entered on these rulings, plaintiff has not appealed from them, and the propriety of the rulings is not before us.

On the night of August 30, 1969 a preseason game between the Los Angeles Rams and the San Diego Chargers was held in the stadium and, as would then have been expected, there was a sell-out crowd of 53,000 fans. During the afternoon it was learned President Nixon and his party would attend the game, arriving by helicopters and buses to be parked in the stadium lot.

While the crowd was arriving, Jones used 80 of its own employees ["whitecoats"] and 15 Tipton men to direct the cars to parking spaces and to collect the parking fees. When the crowd was leaving after the game, the crew had been reduced to 15 "whitecoats" and three Tipton men, two of whom were assigned to direct traffic by the bus-taxi lane. This was as many as Jones had ever used during the "dump" operation. Doubtless because of Nixon's visit, the number of police cars on the lot had been increased from the usual 50 to 90. The officers were assigned to provide protection for the presidential party and to regulate traffic on the public streets leading to and from the stadium and into the parking area itself.

When the game was over, the crowd left the stadium for the parking lot in a rush, as had been expected. Undoubtedly, the congestion and the delay in emptying the parking lot was increased by the presence of the presidential party and the precautionary measures taken by the public authorities to insure its safe and rapid departure from the area. Moments before the incident involving plaintiff's injury, a parking lot attendant working in another section of the bus-taxi lane was struck by a spectator and received a broken nose. Some people, impatient to leave, started knocking over stanchions so they could drive out the bus lane. Patrolman Davis, an employee of Tipton, kept replacing the stanchions as fast as they were knocked over, but he did not call for assistance. Rogers got out of his car to see what was happening. At this point, someone suddenly knocked Davis down, and Rogers immediately grabbed the assailant. During the brief scuffle with the assailant which followed, Rogers' right wrist was fractured.

At trial Rogers testified in his opinion the man just wanted to harass somebody in uniform and that he must have been under the influence of alcohol. Several witnesses testified Jones did a "superior" job of managing the parking facility at the stadium.

Appealing from the $28,621 judgment, Jones does not contest the extent of Rogers' injury but raises issues bearing on its liability.

DISCUSSION

█ Liability founded upon a claim of negligence cannot exist unless a duty of care is owed by the alleged wrongdoer to the person injured, or the class of which the injured person is a member (*Richards* v. *Stanley*, 43 Cal.2d 60, 63 [271 P.2d 23]; *Nevarez* v. *Thriftimart, Inc.*, 7 Cal.App.3d 799, 803 [87 Cal.Rptr. 50]). While the determination of duty is primarily a question of law for the court, its existence may frequently rest upon the foreseeability of the risk of harm. █ Unless the facts present a situation about which reasonable minds cannot differ, foreseeability of harm is a question of fact to be determined by the jury (*Weirum* v. *RKO General, Inc.*, 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]; *Richards* v. *Stanley, supra*, 43 Cal.2d 60, 66; *Wright* v. *Arcade School Dist.*, 230 Cal.App.2d 272, 276-277 [40 Cal.Rptr. 812]).

Here, a finding that plaintiff was exposed to an unreasonable risk of harm is implicit in the jury's favorable verdict. Defendant contends this implicit but essential finding is not supported by the evidence.

As operator of the stadium parking lot, defendant Jones owed a general duty to exercise ordinary care in the management of the premises to avoid exposing persons who came upon the property in the course of its operation of the parking lot to the unreasonable risk of harm (*Rowland* v. *Christian*, 69 Cal.2d 108, 118 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Taylor* v. *Centennial Bowl, Inc.*, 65 Cal.2d 114, 117 [52 Cal.Rptr. 561, 416 P.2d 793]; Rest.2d Torts, § 334). This general duty arose from the fact that Jones, at the time of the incident complained of, was the occupier of the premises with the right to control and manage the property. The duty was neither dependent upon nor limited by Jones' contract with the City of San Diego (*Nevarez* v. *Thriftimart, Inc., supra*, 7 Cal.App.3d 799, 804; Prosser, Law of Torts (4th ed.) p. 339). This general duty included not only the duty to keep the property free from dangerous and defective conditions and to conduct its own activities with due caution, but also the duty to control the wrongful acts of third persons which threatened others on the property, if it had reasonable cause to anticipate such acts and the probability of injury arising from them (*Taylor* v. *Centennial Bowl, Inc., supra*, 65 Cal.2d 114, 121).

When the owner or occupier of land himself creates a dangerous condition on the property or fails to conduct his own activities with reasonable caution (misfeasance), the question of foreseeability of harm to others is generally more easily assessed (see *Weirum* v. *RKO General*,

*Inc., supra,* 15 Cal.3d 40, 47; Prosser, Law of Torts (4th ed.) pp. 339-340). When, as in this case, responsibility for the misconduct of third persons is involved (nonfeasance), the issue of foreseeability frequently becomes so nebulous that courts determine it adversely to the plaintiff as a matter of law (*Richards* v. *Stanley, supra,* 43 Cal.2d 60, 67).

■ While the proprietor of a business or the occupier of land has a general duty to exercise ordinary care for the safety of persons who come upon the property, he is not an insurer of their safety (*Taylor* v. *Centennial Bowl, Inc., supra,* 65 Cal.2d 114, 121), and the duty does not extend to controlling the misconduct of third persons which he has no reason to anticipate and no reasonable opportunity or means to prevent.

"Where . . . it is the conduct of a third party on the premises which directly causes the injury, liability may attach only where the possessor of the premises has reasonable cause to anticipate such conduct and the probability of resulting injury, and fails to take affirmative steps to control the wrongful conduct. (*Taylor* v. *Centennial Bowl, Inc.,* . . . 65 Cal.2d 114, 121 . . . ; *Hunter* v. *Mohawk Petroleum Corp.* . . . 51 Cal.2d 439 . . .; *Edwards* v. *Hollywood Canteen* . . . 27 Cal.2d 802, 809-810 . . . ; *Young* v. *Desert View Managment Corp.* . . . 275 Cal.App.2d 294 . . .; *Richter* v. *Adobe Creek Lodge* . . . 143 Cal.App.2d 514 . . .; *Porter* v. *California Jockey Club, Inc.* . . . 134 Cal.App.2d 158 . . .; *Baley* v. *J. F. Hink & Son* . . . 133 Cal.App.2d 102, 110-112 . . . ; *Worcester* v. *Theatrical etc. Corp.* . . . 28 Cal.App.2d 116 . . . . )" (*Nevarez* v. *Thriftimart, Inc.,* 7 Cal.App.3d 799, 804-805 [87 Cal.Rptr. 50].)

There is a risk of harm peculiarly inherent in the large crowds which attend stadium-held sporting events, and that risk is not dissipated when the thousands of spectators abruptly descend upon the parking area when the event is over. Because of the sheer number of people involved, anticipating and preventing harm to some member of the public by those in charge is difficult under the best of circumstances. When the harm results from a sudden, intentional, malicious and criminal act of a third party, anticipation of harm as well as a reasonable opportunity to prevent its occurrence may approach the impossible.

■ The third party conduct which directly caused plaintiff's injury in this case was sudden, intentional and criminal, and Jones had no reasonable opportunity either to anticipate or prevent it. Until the night in question there had been no reports of violence or assaultive conduct in the parking lot area. Until the incident occurred which resulted in

plaintiff's injury, the evidence does not disclose any conduct by the assailant from which Jones could have reasonably anticipated the likelihood he would commit a criminal assault. To the extent plaintiff's own testimony indicates intoxication may have influenced the assailant's conduct, there is no evidence that Jones furnished the assailant with intoxicating liquor or had any reasonable opportunity to discover his intoxication and to guard against its consequences.

Because fans attending football games had previously exhibited impatience with delays in leaving the parking area after football games, and because some of them had engaged in removing the stanchions and lowering the chains which protected the bus-taxi lane, plaintiff argues Jones should have foreseen or anticipated the assault which caused his injury and could have prevented it by assigning more personnel to the "dump" operation. The evidence is insufficient to support the conclusion reached. The incident which caused plaintiff's injury seems to have been generated by the presence of an attendant, not by the lack of one. Moreover, to have prevented the unexpected conduct involved here, Jones would have been required to assign an attendant or guard to each of the 53,000 fans in attendance. Such precautionary measures would be totally unreasonable and beyond the requirements of ordinary care. While both common experience and the evidence of this case indicate such attacks do occur, neither establishes that they occur with such frequency that the burden of taking precautionary measures to prevent them under the circumstances presented here would not exceed the apparent risk of harm. (See Prosser, Law of Torts (4th ed.) pp. 173-174.)

The evidence of this case does not support the jury's implied finding that Jones' conduct or inaction exposed the plaintiff to an unreasonable risk of harm. Hence no duty of care was established, and the judgment must be reversed. This holding makes it unnecessary to discuss the other issues raised by the appeal.

The judgment is reversed.

Brown (Gerald), P. J., and Whelan, J.,* concurred.

The petition for a rehearing was denied April 5, 1976, and respondent's petition for a hearing by the Supreme Court was denied May 14, 1976. Sullivan, J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.