[No. B011965. Second Dist., Div. Four. Nov. 10, 1988.]

ROYAL NECKWEAR COMPANY, INC., Plaintiff and Appellant, v. CENTURY CITY, INC., Defendant and Respondent.

**COUNSEL**

Kaufler & Scott, Phillip Kaufler and Joan E. Lewis for Plaintiff and Appellant.

Latham & Watkins, Robert A. Long and Nancy G. Scheurwater for Defendant and Respondent.

**OPINION**

**GOERTZEN, J.**—After a jury trial, judgment was entered against plaintiff/appellant Royal Neckwear Company (appellant) and, generally, in favor of defendant/respondent Century City, Inc. (respondent). Asserting three instances of prejudicial instructional error, appellant appeals.

FACTS[1]

Appellant operates several men's clothing and accessory stores under the name "Plaza Street." In August 1976, appellant negotiated a 15-year lease for one of its stores in the Century Square Shopping Center (the mall), which at all relevant times was owned and operated by respondent. The mall was open to the air and located in Century City.

Section 6(b) of the lease provided: "All flashing, counter flashing and roof repairs shall conform to the project roofing specification and such work shall be performed by the original project roofing subcontractor." Robert Burford, vice president and general manager of engineering and operations for respondent, understood this provision to mean that a tenant which wanted to make any roof penetrations was required to contract with the original roofing subcontractor in order to insure consistent roof quality and to protect the warranties.

---

[1] A 10-day trial with 19 witnesses and 55 exhibits produced an abundance of facts. We focus on those which are pertinent to the issues raised on appeal.

Section 7.01 of the lease provided: "Landlord shall, during term of this lease, keep in good order, condition and repair the foundations, exterior walls . . . downspouts, gutters and roof of the premises. Except for any damage thereto caused by any negligent act or omission of tenants or its agents, employees or invitees and except for reasonable wear and tear, provided however that landlord shall have no obligation for repair until 10 days after the receipt by tenant of written notice of a need for repairs. Tenant waives the provisions of any law permitting tenant to make repairs at landlord's expense including but not limited to section 1943 of the California Civil Code." Mr. Burford understood this provision to mean that it was respondent's responsibility to maintain the roof in the event of normal wear and tear and debilitation of the roof because of time.

When respondent transferred occupancy of the store space to appellant, the roof for the entire mall was covered by a continuous membrane, which had been tested for leakage. Before opening, appellant hired an architect to assist in the complete design of its store as a combination jewelry and clothing store. This design and construction work required penetration of the roof.

The week before Christmas 1977, appellant complained to the mall manager about a leak in its ceiling which had caused considerable damage to its store. The mall manager and the project manager for the mall inspected the roof and discovered that the rough cuts around a vent installed by appellant had been sealed improperly. The roofing subcontractor for respondent's general contractor flashed one of the cuts in December and another in January; however, the leaks continued until sometime in February.

Appellant also experienced a drainage problem that allowed water to seep into the front entryway of the store, damaging its carpet. During initial construction, respondent's contractor had properly graded the brick area in front of appellant's store. During appellant's phase of construction, its contractor ground down or lowered the bricks in order to allow the front door to swing open. This grinding of the bricks contributed to the front area sloping towards the store's front door, which itself was the cause of the water collecting, creating appellant's drainage problem.[2]

Respondent made the final determination regarding the amount and type of security at the mall. The amount budgeted for security was developed by the mall manager in conjunction with the manager of security forces. When

---

[2] There was conflicting testimony on this point. Respondent's contractor testified that the bricks in front of the store had been graded and sloped properly during initial construction. Appellant's contractor testified that had the bricks been sloped properly in the first instance, it would not have been necessary to shave them for door clearance.

the mall initially was constructed, four surveillance cameras were installed at each escalator. These cameras operated 24 hours a day and provided good visibility during the daytime; however, after closing, their range was limited due to minimal lighting in the mall. In addition to its own security personnel, respondent contracted with an outside security company to guard the mall.

In early November 1979, three burglaries occurred in the mall. Shortly thereafter, at a regularly scheduled monthly meeting of the mall merchants, respondent discussed the security problem with the tenants. Respondent also hired a second security guard to patrol the mall area, instructed the security guards in the office building area to extend their beat onto the outer perimeters of the mall, and placed an officer on the roof of the mall with binoculars. In addition, the mall manager and the security manager held several meetings with representatives of the Los Angeles Police Department, who were coordinating a program to deal with related burglaries in the area.

On November 18, 1979, and again on November 21, 1979, appellant's store was burglarized. The store lost $33,468 worth of clothing and $167,370 worth of jewelry. These burglaries occurred after respondent had increased its security procedures.

## PROCEDURAL HISTORY

Appellant sued respondent for negligence, alleging damages caused by respondent's failure to provide adequate security services; and for breach of contract, alleging damages caused by respondent's failure to maintain the roof and the common area, specifically the brick flooring located in front of the store. After a trial, the jury found respondent had not acted negligently in providing security services and had not breached its lease agreement in its maintaining the roof. As to the drainage problem, the jury found appellant 40 percent and respondent 60 percent responsible, assessing damages against respondent in the amount of $4,500.

## ISSUES ON APPEAL

Appellant contends that the trial court prejudicially erred when it refused to instruct the jury that: (1) a commercial landlord has a duty to protect its tenants from reasonably foreseeable criminal conduct, and (2) ambiguities in the lease should be construed against respondent; and when it modified instruction number 17 so as to apply comparative negligence language to the contract causes of action. For the reasons stated below, we reject these assertions and affirm the judgment.

## DISCUSSION

In order to demonstrate reversible error, appellant must establish that the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) ■ Moreover, "Whether a jury has been misled by an erroneous instruction or by the overall charge must be determined by an examination of all the circumstances of the case including a review of all of the evidence as well as the instructions as a whole. [Citations.]" (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 59 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

### *Duty of a Commercial Landlord.*

The instruction offered by appellant and refused by the court read as follows: "Where a landlord has notice of previous conduct of a criminal nature by third persons on or near the landlord's premises[,] such as previous burglaries of tenants['] store in the mall[,] a landlord of commercial property owes a duty to a tenant, who is obligated under his lease to pay for security of the common areas[,] to take reasonable action to protect a tenant from reasonably foreseeable conduct of a criminal nature by third persons in common areas of the landlord's premises *and* to warn the tenant of particular dangers of which the landlord has notice. The landlord's failure to perform such duty is negligence." (Italics added.)

■ The question presented by the facts in this case is whether a commercial landlord owes a duty to its tenant to safeguard that tenant's *property* from reasonably foreseeable criminal activity by third parties. No California case has held that such a duty exists; and, for the reasons discussed below, we decline to find such a duty.

The majority of the California cases cited by appellant speak to the duty of a landlord to safeguard its *tenant's* safety. (See *Francis T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447]; *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799 [205 Cal.Rptr. 842, 685 P.2d 1193]; *Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601]; *Penner* v. *Falk* (1984) 153 Cal.App.3d 858 [200 Cal.Rptr. 661]; *Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622 [193 Cal.Rptr. 600]; *Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324 [176 Cal.Rptr. 494]; and *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798 [142 Cal.Rptr. 487].)[3]

---

[3] The other cases cited by appellant are distinguishable. *Maron* v. *Swig* (1952) 115 Cal.App.2d 87 [251 P.2d 770], discussed whether the defendant/landlord was responsible for

In *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], our Supreme Court discussed the fundamental principle that "'All persons are required to use ordinary care to prevent others being injured as the result of their conduct.' [Citations.]" It noted that the historical exception to this general rule imposed little if any duty on the possessor of land. While the possessor owed an invitee (business visitor) a duty to exercise ordinary care to avoid injuring him, the only duty owed to a trespasser or licensee (social guest) was to refrain from wanton or willful injury. The court noted that this exception was due to "historical considerations stemming from the high place which land has traditionally held in English and American thought, the dominance and prestige of the landowning class in England during the formative period of the rules governing the possessor's liability, and the heritage of feudalism. [Citation.]" (*Id.,* at p. 113.) It concluded that an "increasing regard for human safety" and the confusion stemming from attempts to apply or circumvent common law classifications mandated a formulation of a new rule. (*Id.,* at p. 114.) Accordingly, the court held that the liability of a possessor of land is determined by whether he or she has acted as a reasonable person in view of the probability of injury to others. (*Id.,* at p. 119; see also Prosser & Keeton on Torts (5th ed. 1984) § 64, pp. 446-450.)

The *Rowland* court rejected the old common law rules because injury to a person was involved. The concerns inherent in such a situation do not translate to one involving injury to property. Appellant contends that respondent owed it a duty to protect it against and warn it about loss of its property caused by burglary. We cannot find such a duty exists because it is the tenant that is in the best position to take steps to protect the safety of its own property; there is no moral blame to be ascribed to a failure to prevent another's property from being stolen; it would place an onerous financial burden on a landlord—which eventually would be passed on to all of its tenants—to hold it responsible for the loss of its tenants' property; and a tenant can easily obtain insurance to cover any such loss.

The trial court thoroughly instructed the jury concerning respondent's obligation to act nonnegligently. Without quoting all the pertinent instructions, we note that the court charged the jury with BAJI Nos. 8.00, 3.10, and 3.11. The trial court did not err when it refused appellant's proffered instruction.

---

thefts that occurred at its jewelry store tenant when those thefts were committed by one of the landlord's agents. Here, no allegations of involvement by respondent's agents have been made. *Vermes* v. *American Dist. Tel. Co.* (1977) 312 Minn. 33 [251 N.W.2d 101], discussed whether a commercial landlord owed a duty to warn the tenant that the roof over tenant's jewelry store was vulnerable to easy penetration. The court found such a duty existed. Even if we were inclined to follow the *Vermes* court's lead, no allegation has been made that hidden defects or vulnerabilities in the appellant's store contributed to these burglaries.

*Contract Ambiguities.*

■ Appellant asserts the court erred when it refused to charge the jury with the following instruction: "Where a lease is prepared by the landlord, any unclear or ambiguous provisions should be construed against the landlord." According to appellant, the lease was ambiguous in regard to the respondent's obligation (1) to provide security because the lease obligates the mall's tenants to pay for the security services provided, while at the same time providing that respondent need only procure such security services "if and to the extent [it desires]"; and (2) to repair the roof because the lease requires respondent to repair the roof while at the same time stating it is not responsible for any damage to fixtures or merchandise resulting from water leakage.

The court refused this instruction because it found the lease contained no ambiguities. We concur. ■ "Ambiguity is defined as '[d]oubtfulness; doubleness of meaning. . . . Duplicity, indistinctness, or uncertainty of meaning of an expression used in a written instrument. . . . Want of clearness or definiteness; difficult to comprehend or distinguish; of doubtful import.' " (*Estate of Black* (1962) 211 Cal.App.2d 75, 85 [27 Cal.Rptr. 418].) The lease provisions regarding both issues are clear. ■ The lease obligates the mall's tenants to pay for certain common area costs including those for security, but reserves to respondent the responsibility to determine what level of service to provide; and, while imposing an obligation on respondent to bear the cost of keeping the roof on the mall in good repair, it provides that respondent is not responsible for any consequential damages arising out of its failure to do so. The trial court properly concluded that neither provision was ambiguous.

*Modification of Instruction 17.*

The instruction to which appellant objects was given as follows: "If you find that plaintiff's damages were legally caused by a combination of the negligence or breach of contract by Century City and the contributory negligence of the plaintiff, you will determine the amount of damages to be awarded by you as follows: separately as to the roof leak damage, flooding damage and burglary damage. [¶] As I told you[,] you are going to have three segments in the interrogatory. First you will determine the total amount of damages to which the plaintiff would be entitled under the

court's instructions if the plaintiff had not been contributorily negligent. [¶] Second you will determine what proportion or percentage is attributable to the plaintiff of the total combined negligence of the plaintiff and of Century City whose acts legally contributed to the damages. [¶] Third, you will then reduce the total amount of plaintiff's damages by the proportion or percentage of negligence attributable to the plaintiff. [¶] Four [*sic*] the resulting amount after making such reductions will be the amount of your verdict."

■ Appellant argues this instruction was improperly framed in the terminology of comparative negligence, which is associated with tort claims, not claims based in breach of contract. Appellant objects to the fact that this instruction allowed the jury to hold it responsible for a portion of the damages that resulted from the improper sloping of the area adjacent to its front door.

While the instruction might have been more artfully phrased, we do not find it prejudicially erroneous. It is well established that a party injured by breach of contract is required to mitigate his or her damages. Accordingly, that person cannot recover damages for detriment which he or she could have avoided by reasonable effort. (*Sackett* v. *Spindler* (1967) 248 Cal.App.2d 220, 238-239 [56 Cal.Rptr. 435].) The evidence produced by trial and summarized above, indicates that appellant further ground down the bricks in the front of its store, thereby becoming partially responsible for the sloping, which caused the drainage problem. This instruction was the court's effort to give the jury instructions which would provide it with some guidance on how to reflect appellant's failure to mitigate its damages. For several reasons, the use of the term "contributory negligence" to generally describe the effect appellant's own actions might have on the amount of damages to be awarded under both its contract and tort claims is insignificant. First, the court clarified that appellant's claims regarding alleged problems with the roof and front entry were for a breach of the lease, whereas the claim respecting the burglaries was grounded in negligence. Second, shortly before giving the challenged instruction, the court instructed the jury that they were going to be asked to make a "similar type" of reduction in their award on both the breach of contract and negligence claims if they found that appellant was itself responsible for some portion of the damages suffered. Third, the form of the special findings used was neutrally worded and provided the jury with whatever appropriate guidance was needed.

The judgment is affirmed.

Woods (A. M.), P. J., and George, J., concurred.